# EXHIBIT "1"



## Division of Human Rights

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ROBERT CROSBY,
                             Complainant,

v.

STEW LEONARD'S YONKERS LLC, STEW
LEONARD, JR.,
                             Respondents.

DETERMINATION AFTER
INVESTIGATION

Case No.
10212170

Federal Charge No. 16GC101950

       On 6/1/2021, Robert Crosby filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondents with an unlawful discriminatory practice relating to employment because of age, disability, sex, opposed discrimination/retaliation, race/color in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

       After investigation, the Division has determined that it has jurisdiction in this matter and that <u>PROBABLE CAUSE</u> exists to believe that the Respondents have engaged in or are engaging in the unlawful discriminatory practice complained of.

       Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated:    November 30, 2021
            White Plains, New York

STATE DIVISION OF HUMAN RIGHTS

By: _____
Linda Fenstermaker
Regional Director

# Information to the Parties
# Following Determination of Probable Cause

The New York State Division of Human Rights ("Division") is the administrative agency charged with enforcing the New York State Human Rights Law. The Division investigates complaints of discrimination, determines whether there is probable cause to believe that discrimination has occurred, and conducts a public hearing of the complaint where probable cause is found. Probable cause has been found in this case, and the matter will now proceed to a public hearing before an Administrative Law Judge.

If a Complainant does not have a private attorney, the Division will assign an attorney to present the case in support of the complaint. The Division attorney at all times represents the Division, not the Complainant personally. Substitutions and reassignments of Division attorneys and Administrative Law Judges are within the Division's discretion.

The hearing process will start with the preliminary conference conducted by telephone, at which time the hearing dates for the taking of testimony will be agreed upon. There is no formal discovery. Parties must exchange document and witness lists prior to the preliminary conference.

The preliminary conference will include an opportunity for the parties to discuss possible settlement of the case. If Respondent wishes to make an offer of settlement prior to that time, Respondent should contact the Director of Prosecutions at (718) 741-8396.

The parties have a continuing obligation to keep the Division advised as to all changes in the case including:

1. Changes in name, address, email address and/or telephone number of the parties and successors in interest. **Due to COVID-19 the Division is conducting public hearings by video conference. Therefore, an email address must be provided if you have not already provided one.** See further information below in the FAQs.
2. Commencement of proceedings in another forum.
3. Settlement of the case.

Any of the above information should be timely provided to the Division, IN WRITING on the attached form to the following by mail, email or fax:

**New York State Division of Human Rights
Attn: Chief Administrative Law Judge
One Fordham Plaza, 4th Floor
Bronx, New York 10458
Fax: (718) 741-8333
Email: hearing-correspondence@dhr.ny.gov**

Information to the Parties
Page 2

If the Complainant wishes to seek dismissal of this matter to proceed in an alternate forum, an application should be filed with the Chief Administrative Law Judge at the above listed address, preferably within twenty (20) days of the date of this determination.

The parties also have a continuing obligation to maintain certain information and records such as:

1. Parties must keep track of the whereabouts of their witnesses.

2. Parties are obligated to identify and preserve all evidence relating to the case, including evidence relating to any incidents which relate to the case that occur after the Division makes a finding of probable cause, and including all evidence whether for or against that party's interests.

3. Parties are responsible for recording and keeping evidence relating to any increase or reduction in damages.

Finally, if you would like to request a copy of the investigation file, please do so promptly. Put your request in writing to:

**New York State Division of Human Rights**
**Attn: FOIL Officer**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8256**
**Email: foil@dhr.ny.gov**

Please note that your request for documents, or the Division's response or date of response thereto, will not affect the date of the hearing, and cannot be used to request a postponement or rescheduling of the hearing. Costs for copying, established by statute, will apply.

# INFORMATION ABOUT THE HEARING PROCESS

The following are general responses to frequently asked questions. The responses are not legal advice and should be used for informational purposes only.

## WHAT LAWS GOVERN THE HEARING PROCESS?

The New York State Human Rights Law (N.Y. Exec. Law, art. 15), and the Division's Rules of Practice (9 N.Y.C.R.R. § 465) outline the policies and procedures that govern the hearing process held at the New York State Division of Human Rights. The Human Rights Law and the Division's Rules of Practice are available on the Division's website at www.dhr.ny.gov. The New York Civil Practice Law and Rules and the Federal Rules of Procedure and Evidence are inapplicable to Division proceedings, although they are relied upon as a guide for the orderly introduction and acceptance of evidence. Please cite to New York State case law wherever possible in all submissions to the Division.

## WHAT IS A PUBLIC HEARING?

Where the Division finds probable cause after investigation, the Human Rights Law requires that the entire case be heard at a public hearing before an administrative law judge, where all relevant evidence is presented and the testimony of witnesses is taken under oath and subject to cross-examination.

A public hearing is a trial-like proceeding at which relevant evidence is placed in the hearing record. It is a hearing *de novo*, which means that the Commissioner's final decision on the case is based solely on the content of the hearing record. The public hearing is presided over by an Administrative Law Judge (ALJ), and a verbatim transcript is made of the proceedings.

The hearing may last one or more full days. The hearing sessions are generally scheduled on consecutive days. Parties are notified of all hearing sessions in advance, and the case may be adjourned to a later date only for good cause.

Respondent can retain private counsel for the hearing. If Respondent is a corporation, it is required to be represented by legal counsel. Complainant can retain private counsel for the hearing but is not required to do so. If Complainant is not represented by private counsel, the Division's counsel prosecutes the case in support of the complaint. Attorneys for the parties or for the Division may issue subpoenas for documents and/or to compel the presence of witnesses.

After the public hearing is concluded, the ALJ prepares a recommended order that is sent to the parties for comment.

After comments are received, the Commissioner issues a final order. The Commissioner either dismisses the complaint or finds that discrimination occurred. If the Commissioner finds that discrimination occurred, Respondent will be ordered to cease and desist and take appropriate action, such as reinstatement, training of staff, or provision of reasonable accommodation to a

known disability. The Commissioner may award money damages to Complainant, including back pay and compensatory damages for mental pain and suffering, and in certain instances, punitive damages and attorney fees. The Commissioner may also order Respondent to pay civil fines and penalties to the State of New York. Either party may appeal the Commissioner's Order to the State Supreme Court within 60 days. Orders after hearing are transferred by the State Supreme Court to the Appellate Division for review.

# FREQUENTLY ASKED QUESTIONS

1. **How is the Division conducting public hearings during the COVID-19 pandemic?**

   During the COVID-19 pandemic, all public hearings are conducted via videoconferencing, Zoom. The Division has suspended all in-person public hearings until further notice.

2. **Will my hearing be a public hearing, although it is conducted via Zoom?**

   Yes. All scheduled public hearings will be posted on the Division's website, with instructions to the public about how to gain access to the public hearings by sending an email to: hearing-correspondence@dhr.ny.gov.

3. **When should an answer to the complaint be filed?**

   At least two business days prior to the scheduled preliminary conference, Respondent and any necessary party, must file a written answer to the complaint, sworn to and subject to the penalties of perjury. The written answer must be filed with the assigned ALJ and served upon each of the other parties to the proceeding. The answer must contain all affirmative defenses.

4. **When should the preliminary conference statement be filed?**

   At least five days before the scheduled preliminary conference date, the parties must submit the following information to the assigned Administrative Law Judge, a copy of which must be served upon each of the other parties: (a) a brief statement of each issue in the case; (b) a detailed description of each proposed exhibit and its relevance to the issues identified; and (c) a list of proposed witnesses, with an explanation of their identity and the scope of their knowledge of the facts of the case.

5. **When should the parties exchange exhibits?**

   The parties must exchange their proposed exhibits at least five days before the scheduled preliminary conference.

6. **How do I communicate with the ALJ?**

   All formal papers, including, but not limited to the answer, must be submitted via personal service, mail or fax (with an original to follow), with a copy to all parties, for proper docketing and timely filing. Formal papers submitted via electronic mail (hearing-correspondence@dhr.ny.gov) are deemed courtesy copies and do not constitute proper service.

7. **Can I speak with the ALJ?**

   Ex-parte communication (i.e., by only one party) with the ALJ assigned to the case is strictly prohibited. The parties may jointly request a conference with the ALJ through the Office of Administrative Law Judges.

8. **What do I bring to the public hearing, such as documents, witnesses, etc.?**

   You should bring all documents and witnesses relevant to your claims and/or defenses. You should also bring proper identification.

9. **What if I need interpretation services?**

   Interpretation services will be provided at no charge. Please alert your Division representative and the Office of Administrative Law Judges at (718) 741-8255 if an interpreter is required.

10. **What should I do if I have a conflict with the hearing date that is scheduled?**

    You should submit, as soon as possible, a written request for an adjournment of the hearing, stating the basis for your request, to the ALJ assigned and all parties.

11. **On what basis will the ALJ grant an adjournment?**

    No adjournment of the hearing shall be granted except for actual engagement before a higher tribunal or for other good cause shown. **Settlement discussions or settlement in principle do not constitute good cause.**

12. **What is the proper attire?**

    Please dress in a manner that shows respect for these important proceedings.

13. **Am I allowed to eat during the public hearing?**

    No. But you are allowed to bring water.

14. **What do I do with my cellphone or other electronic device?**

    All cellphones and other electronic devices must be turned off or placed in silent mode during the hearing, unless you are participating by telephone or videoconferencing.

    Attorneys, parties, witnesses, and any other persons attending the hearing are prohibited from taking photographs, making video or audio recordings, broadcasting or telecasting the public hearing, at any time, whether or not the public hearing is in session.

15. **What happens if I do not appear for the public hearing?**

    Complainant's failure to appear at a public hearing may result in a dismissal of the complaint. Respondent's failure to appear may result in a default finding against that Respondent.

16. **How long is the public hearing?**

    Public hearings are generally scheduled for two (2) days. Each scheduled date starts at 9:30 a.m. and ends at 5:00 p.m. Be prepared to be present until the end of the day.

17. **Can I bring my child(ren) to the public hearing?**

    No. You must make childcare arrangements.

18. **Are electronic signatures accepted?**

    No. Please refer to the New York Technology Law § 304 and the New York Electronic Signatures and Records Act for more information.

19. **May an attorney not admitted in New York State represent a party at a public hearing?**

    Please see **22 N.Y.C.R.R. § 523.2** and guide yourself accordingly.

20. **May a law student admitted to the practice of law pursuant to an Appellate Division Order and under the supervision of a licensed attorney appear at a public hearing?**

    Please see **22 N.Y.C.R.R. § 805.5,** Judiciary Law **§ 478** and **§ 484**, and relevant Appellate Division rules.

# IF YOU MOVE, SETTLE, OR INTEND TO CHANGE FORUM
## Complete, sign and date, and return this form to:

**New York State Division of Human Rights**
**Attn: Chief Administrative Law Judge**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8333**
**Email: hearing-correspondence@dhr.ny.gov**

Re:   Robert Crosby v. Stew Leonard's Yonkers LLC, Stew Leonard, Jr.
      Case No. 10212170

Name: _____

Address: _____
_____

Telephone: _____   Email address: _____

I will be at my new address after: _____

**New NAME ☐   ADDRESS ☐   EMAIL ☐   and/or TELEPHONE NUMBER ☐**

Please indicate below the name, address, and telephone number of a person who may be contacted and who will know your whereabouts if the Division cannot locate you:

_____
_____
_____

**Commencement of proceedings in another forum, or settlement:**
Below please indicate, for other proceedings, the name of the forum and the name, address, and telephone number of the attorney handling the matter. For settlement, please explain briefly the circumstances under which the case was settled, and whether terms have been complied with.

_____
_____
_____

_____          _____
Signature                                Date

_____
Print Name

# NEW YORK STATE
# DIVISION OF HUMAN RIGHTS

TO:     Files

FROM:   Linda Fenstermaker
        Regional Director

REGION: White Plains

DATE: November 29, 2021

SDHR CASE NO: 10212170-21-E-ADRSO-E

Federal Charge No. 16GC101950

SUBJECT:    Robert Crosby v. Stew Leonard's Yonkers LLC; Stew Leonard, Jr.

## FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I.  CASE SUMMARY

This is a verified complaint, filed by Complainant, Robert Crosby, on Tue 6/1/2021. Complainant who is 57 years of age (YOB 1964), male, Black, has a disability (COVID-19 issues) and alleges he has opposed Respondent's unlawful discriminatory practices, charges Respondent with unlawful discriminatory practices in relation to employment because of age, disability, sex, opposed discrimination/retaliation, race/color.

### II.  SUMMARY OF INVESTIGATION

Complainant's Position:

Complainant began his employment with Respondents in February 2001 and has worked as a Loss Prevention/Manager. His employment was terminated on September 28, 2020.

On March 05, 2020, Complainant attended a manager's meeting in which he raised concerns about Respondents' operations and the lack of PPE during the COVID-19 outbreak. On March 18, 2020, Respondent Stew Leonard (owner; Caucasian, 66 years of age) told managers during a manager zoom meeting that he did not want them social distancing. Complainant complained to Ellen Story (Director Human Resources; Hispanic/biracial late 40s) that Respondents' refusal to permit employees to wear masks was a threat to their safety. In March 2020, 50 of Respondents' employees tested COVID-19 positive and Respondents failed to shut down the store for deep cleaning.

On April 03, 2020, Complainant tested positive for COVID-19. Complainant went out on FMLA until June 22, 2020 and Respondents allowed Complainant to use his accruals to stay out until July 22, 2020. Complainant claimed that even though he was still sick due to COVID-19,

he had his doctors clear him to return to work on July 22, 2020 because he feared being terminated. Complainant returned to work sick and worked until August 13, 2020 at which time he took family and personal time off to rest and recover.

Complainant again returned to work on September 01, 2020 even though he was still sick. On September 04, 2020, Complainant asked Cristian Cruz (Vice President; Hispanic, late 40s) permission to leave at 1:00 pm to see his doctor. On September 05, 2020, Complainant was hospitalized with gastrointestinal issues until September 11, 2020. While in the hospital on September 09, 2020, Cristian Cruz asked him to work and to schedule a police detail for Respondents' store. Complainant complied with Mr. Cruz's request and scheduled a police detail for September 10, 2020.

In an email on September 28, 2020, Ellen Story terminated Complainant's employment even though he had apprised Respondents of his medical condition.

Complainant also claimed that during his tenure with Respondents, Respondent Stew Leonard (owner) made racially and sexually offensive remarks about women, Blacks, and Jews. Respondent Stew Leonard would remark that Henry Gordon (Black, late 50s) had a "big dick" in late 2011 and use the "N" word freely multiple times. Respondent Stew Leonard also would comment that Taihili Toppin (female, Black, late 40s) had big Black lips in 2015 and 2016. Further, during a Christmas party in 2010, Respondent Stew Leonard made upper management dress in sexually suggestive attire and accessories, including fake breast, lingerie, sex toys, and present a skit that many found offensive.

Respondents' Position:

Respondents claimed that Complainant's allegations and complaints about the lack of compliance with CDC guidelines do not fall under the Division's review.

Respondents noted that Complainant did not raise complaints about offensive race and sex comments and jokes until he filed the instant complaint on June 01, 2021. Respondents noted that more than one year before the filing of this complaint, Complainant was out of work from May 26, 2020 through July 22, 2020. He took two weeks paid time off on August 13, 2020 and then was out again from September 4, 2020 through September 28, 2020, the date that his employment was terminated. In the one-year period preceding his complaint, Complainant had worked a total of just over four weeks. Respondents denied any meetings with Respondent Stew Leonard (owner) in that limited window and his allegations of racially and sexually insensitive comments could not have happened. Complainant's allegations of sexually offensive behavior would not be timely because there was no Christmas party in 2019 or 2020.

Respondents claimed that Complainant had exhausted/exceeded all available leave. His medical information did not indicate that he might be able to return to work with or without a reasonable accommodation. At the end of September 2020, the information provided disclosed that he was unable to return to work and would be re-evaluated in a month. After his statutory leave was exhausted, he was granted two months additional leave by Respondents. While this accommodation enabled his return to work in July 2020, as of the end of September 2020,

according to his medical information, his return to work date was indefinite. Respondents noted that five months later, Complainant was still unable to perform his regular job duties and had been receiving long term disability benefits.

Respondents admitted that Ms. Story (Human Resources) requested medical information from Complainant for purposes related to COVID-19 contact tracing and oversight on requests for leaves of absence. Ms. Story denied that she harassed or intimidated Complainant. Respondents denied that any assurances were made to any employee that they would be returned to work regardless of the length of time they were out. Respondents denied that Complainant's medical provider ever stated that he was able to work from home or that he could perform his job duties with or without reasonable accommodations. Respondents admitted that Mr. Cruz knew that Complainant's absence in September was due to diverticulitis and that Mr. Cruz would have told Complainant to concentrate on getting better. Mr. Cruz did not have any authority to and did not make any promises of continued employment contrary to Respondents' leave policies. Complainant knew that Human Resources was responsible for all such matters. Respondent Stew Leonard admitted each accommodation request related to a disability is handled based upon its circumstances and the particular medical information provided by the employee.

Respondents noted that Complainant's assertion of age discrimination included no specifics and that 85 of Respondent's employees are older than Complainant.

Complainant's Rebuttal:

Complainant claimed that he continuously asked Respondents in his emails about reasonable accommodations that Respondents could grant him but Respondents never committed to any accommodation. Complainant stated that while he did request to work from home, Respondents never replied. During his entire time out, he did work from home on supervision, wrote emails, text messages, made phone calls and performed scheduling, problem solving, Q&A, contact and correspondence with Yonkers Police Department, his team members, and managers.

Complainant acknowledged that on July 22, 2020, he returned to work with no restrictions. When he returned, he spoke with Cristian Cruz (Hispanic, late 40s) and Felix Rodriguez (Hispanic, late 40s) Director, and told them that he had returned to work so he would not be fired. Complainant told them both that he was still having medical and mental issues. Both told him to "take it easy, go slow, if you need anything let me know; if I need to leave early don't worry about it, I got you."

On August 13, 2020, Complainant took two weeks sick time off while still suffering from COVID issues and on September 4, 2020 left work early. Complainant advised Cristian Cruz in the morning that he was having abdominal issues. Complainant asked Mr. Cruz if it would be okay for him to leave a little early because he was experiencing issues with diverticulitis and had a doctor's appointment in Newburg. Mr. Cruz replied, "No problem Rob do it and take care of yourself."

On September 15, 2020, Complainant submitted a doctor's note which recommended that Complainant be excused from work during a period and notified of a follow up exam on September 21, 2020. On September 28, 2020, Respondents terminated his employment.

Complainant denies that Ellen Story's (Human Resources) request for information was related to contact tracing.

On September 19, 2020, while Complainant was in the hospital dealing with diverticulitis, COVID and other medical issues, he received a phone call from Cristian Cruz, the Vice President of Yonkers Stew Leonard's store. Complainant advised that he was experiencing COVID, diverticulitis gastrointestinal pain, breathing and fatigue issues. Complainant advised Mr. Cruz that he had diverticulitis and an abscess on his colon and may need surgery if the medications did not work. Mr. Cruz told Complainant that he also experienced diverticulitis and understood the pain. Complainant said to him, "I'm going to need time off. This is bad, I'm not sure when I'm going to get out or how long to recover." Mr. Cruz replied, "Don't worry about it. Take your time, take all the time you need and get better. Concentrate on getting better, just get better." The call ended due to pain. Complainant claimed that in encouraging Complainant to work multiple times while he was sick in the hospital, Cristian Cruz had in fact granted a "reasonable accommodation" for him to continue his duties remotely.

Complainant noted that COVID was still an "unknown" at the time and to provide a specific date without a follow up evaluation, examination, by a doctor is a lot to ask and was not realistic. COVID was constantly changing and had different effects on people. Complainant noted that Respondents terminated his employment instead of extending his leave.

Investigator's Observations:

Complainant Interviews:

Complainant claims that Respondent Leonard had a drinking problem and would often use slurs such as "Nigger" and "Bitch." While Complainant acknowledged that he was never personally the subject of sexist, ageist, racial offensive comments by anyone with Respondents, he has personally heard Respondent Leonard make these racially insensitive comments. On March 11, 2020, Respondent Stew Leonard told him that he did not know how "you guys do it all day with those hot bitches." Complainant claims that Respondent Stew Leonard has used the "N" word frequently/freely multiple times. On March 18, 2020, Respondent Stew Leonard told him to tell "that Nigger" to pull his pants up or get rid of him." Respondent Leonard also referred to young Black employees as "thugs." Complainant verbally complained to Ellen Story (Human Resources) about Respondent Leonard's behavior, and she replied that "that's Stew being Stew." Complainant claims that Respondent Stew Leonard made racially and sexually offensive remarks about women, Blacks, and Jews over the years, including in late 2011 when Respondent Stew Leonard said that Henry Gordon (Black, late 50s) had a "big dick"; in 2015 and 2016, Respondent Stew Leonard said that Taihili Toppin (female, Black, late 40s) had big Black lips; and at a Christmas party in 2010, Respondent Stew Leonard made upper management dress in sexually suggestive attire and accessories, including fake breast, lingerie, sex toys, and present a skit that many found offensive.

When asked about his age discrimination complaint, Complainant acknowledged that Respondents employed younger and older employees. Complainant had worked for Respondents for close to 20 years, and as a loyal dependable employee, his employment should not have been terminated because he had gotten sick on the job.

Complainant claimed that his medical notes indicated that he should have been excused from work until his follow-up appointment. If Respondents had wanted a more specific return date, they could have contacted his doctor.

The Division reviewed the following records from Complainant:

An undated photo that showed Ellen Story (Vice President of Human Resources) present with Respondent Stew Leonard who wore a woman's costume with fake breasts.

March 06, 2020 email from Ellen Story to Managers informing them that a rumor of an employee's spouse's return from China and failure to quarantine was false.

March 28, 2020 email from Ellen Story to Complainant informing him that Respondents will notify any co-workers who may have had close contact with an ill individual.

March 28, 2020 email from Ellen Story advising Managers that Respondents did not have masks but were then looking to purchase some. Employees may wear their own mask.

March 31, 2020 email from Walter Watson (Head of Safety) to the Coronavirus Task Force (Managers and Upper Management). Complainant was not a member of task force. The email notes the impact any one case may have and stresses the need to social distance at work.

April 04, 2020 email from Ellen Story to Kate Connick informing her that she had been in contact with an unnamed person (Complainant) who had tested positive for COVID-19.

April 09, 2020 email from Ellen Story to Managers noting that the wearing of masks and gloves are required for anyone working the sales floor.

April 03, 2020 email from Complainant to Ellen Story in which Complainant claims that Respondents had not protected employees appropriately.

Collection letter (medical note), dated March 31, 2020, reports that Complainant had tested positive for COVID-19.

June 16, 2020 through July 02, 2020 emails between Complainant and Frank DeSantis (Human Resources) requesting medical notes and updates on Complainant's return to work. Complainant requested to work from home in the July 02, 2020 email. The Division notes that there was no follow up response to this request.

Respondents' webpage posting of a statement that claims that Respondents are keeping employees safe.

Medical note of Doctor Gupta, dated July 21, 2020, noting that Complainant may return with no restrictions. No diagnosis is reported in the note.

The Division reviewed the following information from Respondents:

June 10, 2020 email from Ellen Story, HR Manager to Complainant about the approaching end of Complainant's FMLA entitlement, availability of additional leave under Respondents' policies and the need for medical documentation of estimated return to work date.

June 16, 2020 email between Complainant and Frank DeSantis (HR Specialist) requesting updated medical information. Medical note dated June 13, 2020 from Dr. Ranin-Lay stated that Complainant had been seen via telehealth on June 12, 2020 and would be seen again on June 30, 2020 and that Complainant should be excused from work in the meantime.

June 24, 2020 email from Frank DeSantis (HR Specialist) to Complainant. Mr. DeSantis received the updated note and asked if the doctor is able to provide an "anticipated return-to-work date."

June 30, 2020 medical note of Maria T. Ranin-Lay, MD. Dr. Ranin-Lay disclosed that Complainant had been seen via telehealth on June 30, 2020 and that a telehealth appointment was scheduled for July 14, 2020 for COVID evaluation. The doctor recommended that Complainant should be excused from work during this time.

July 3, 2020 email from Frank DeSantis to Complainant retroactively approving a personal leave through July 22, 2020 for Complainant under Respondents' policy because Complainant's FMLA leave had expired. Respondents noted that Complainant never formally applied for such leave. Mr. DeSantis stated, "I agree that we should have a more focused discussion about any continuing medical needs once your medical provider allows you to return to work (at or before the expiration of the leave) and provides an explanation of any restrictions or other conditions on your return to work."

July 14, 2020 email in response to Complainant's inquiry, in which Mr. DeSantis explains that continuation of Complainant's employment after the end of his personal leave will depend mainly on any information Complainant's medical provider submits prior to the end of Complainant's leave.

July 16, 2020 email from Complainant to Frank DeSantis. Complainant inquires whether a return to work on a limited basis would jeopardize his disability and/or worker's compensation benefits. Mr. DeSantis replies that it would be reviewed after Respondents receive information from the medical provider. Mr. DeSantis acknowledged that Complainant had had two appointments, with a primary care physician and pulmonologist on July 14, 2020 and requested from Complainant the most up-to-date medical notes from those visits.

September 14, 2020 medical note of Dr. Katherine Kim. The note indicated that Complainant will be re-evaluated on September 21, 2020. No expected return to work date was provided.

September 28, 2020 email and letter from Ellen Story to Complainant. Ms. Story disclosed that Complainant's employment was terminated because he had exhausted his "protected leave" as of July 22, 2020 and noted that Complainant had been absent an additional three and a half weeks without an expected return to work date.

September 30, 2020 medical note of Katherine Kim, MD. Dr. Kim noted that Complainant had been evaluated on September 30, 2020 and should be excused from work and that he would be reevaluated in a month.

Respondents provided age and race composition for their staff for the period from January 2020 through August 2021. According to this information, 85 employees for Respondents are older than Complainant and that Respondents employs 253 Black employees.

Submitted by: Kevin T. Lynch
Kevin T. Lynch
Human Rights Specialist 1
*The above should be considered my electronic signature due to present circumstances involving the response to the COVID-19 pandemic*

### III.   BASIS FOR DETERMINATION

A review of the record reveals that there are material issues of fact and credibility which are best resolved at a public hearing before an Administrative Law Judge where testimony is taken under oath, and witnesses are subject to cross examination, and a full record is made.

To support his assertions, Complainant points to Respondents' decision to terminate his employment after he tested positive for COVID-19 and was out on medical leave. Complainant claims that on March 31, 2020 he was diagnosed with COVID-19, took a leave of absence and updated Respondent on his medical status. Complainant returned to work in July 2020 for a couple of days but then became ill and stayed out of work. Although he provided Respondents with updated medical notes on his medical condition that recommend that he stay out of work, Respondent terminated his employment on September 28, 2020.

Complainant also asserts that he has been subjected to a hostile work environment due to the owner's derogatory comments about his own race as well as offensive comments made about women. He asserts that Respondent Steward Leonard (owner) has used derogatory comments when addressing other employees, including referring to Black individuals as "nigga," women as

"bitches." He notes that workers were required to wear sexually inappropriate attire and accessories, including lingerie, fake breasts, sex toys, at work gatherings.

On the other hand, Respondents deny discriminating against Complainant due to his age, race, disability and/or sex. Respondents assert that they terminated Complainant's employment because Complainant had exhausted/exceeded his available leave. Specifically, Complainant took medical leave beginning from May 26, 2020 and remained out on leave for a majority of the period until the end of September 2020. While Complainant provided medical notes, these notes did not indicate that he would be able to return to work with or without a reasonable accommodation by a definite date. When Complainant's statutory leave was exhausted in June 2020, Respondent granted him almost two more months of additional personal leave. By the end of September 2020, when Complainant continued to fail to provide a return to work date, Respondents terminated Complainant's employment.

As for Complainant's allegations of racially and sexually offensive comments and jokes, Respondents note that Complainant never raised these complaints until he filed this instant complaint on June 01, 2021. Complainant was out on leave from May 26, 2020 through July 22, 2020, more than one year prior to his filing of the Division complaint. He took two weeks paid time off on August 13, 2020 and then was out again starting September 4, 2020 through September 28, 2020, the date that his employment was terminated. Complainant worked a total of just over four weeks in the one-year period preceding his complaint. As there were no meetings with Respondent Leonard during that limited window, his allegations of racially and sexually insensitive comments could not have happened. Respondents noted that there was no Christmas party in 2019 or 2020 and Complainant's allegations of sexually offensive behavior at the Christmas party would not be timely.

Probable cause to believe that unlawful discrimination occurred exists when, after giving credence to Complainant's version of the facts, some evidence of discrimination exists. In this case, it is recommended that the matters of unlawful discrimination based proceed to public hearing where the issues can best be resolved by an Administrative Law Judge and where all the parties will obtain a full and fair opportunity to present their contentions and testimony under oath.

Initially, for workplace harassment alleged to have occurred on or after October 11, 2019, or alleged to have continued until or beyond that date, the legal standard for actionable harassment, including but not limited to sexual harassment, has been changed by an amendment to the Human Rights Law. To be an unlawful discriminatory practice, harassment is no longer required to be "severe or pervasive." The amendment added the following new paragraph:

> 1. It shall be an unlawful discriminatory practice:
> (h) For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in

any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences.

Executive Law, art. 15 (Human Rights Law) § 296.1(h). These new standards have been applied in order to make a determination in this case as to whether there is probable cause to believe that unlawful discrimination has occurred, based on the evidence obtained from the investigation.

Regarding the timeliness of the harassment allegations, complainants have one year to file with the Division, pursuant to Human Rights Law § 297.5. However, the time to file is affected by certain Executive Orders issued by Governor Cuomo during the COVID-19 pandemic. The time to file was tolled for 229 days by the suspension or extension of time for various legal deadlines from March 20, 2020, to November 3, 2020. Therefore, while this case was filed more than one year after some of the allegations, the Division will process this case as timely with regard to allegations back to October 16, 2019. The Executive Orders are 202.8, 202.14, 202.28, 202.38, 202.48, 202.55, 202.60 and 202.67. All eight Executive Orders can be found on the Division's website, www.dhr.ny.gov.

Here, Complainant claims that Respondents subjected him to hostile work environment that included the owner's pattern of using gender and race slurs to refer to workers who are women and persons who are Black. He notes that Respondents have held a holiday party where staff wore sexually suggestive clothing and accessories. The record includes a photo of individuals wearing fake breasts at a holiday party.

Further, Complainant claims that Respondents terminated his employment while he was on medical leave. His physicians verified the leave request for complications due to his COVID illness. The record includes multiple medical notes that recommend that Complainant remain out of work pending the following month's medical visit and evaluation. Respondents do not deny that they received these medical notes but claim that Complainant effectively sought an indefinite leave because the medical notes provided included no specific return to work date.

As for Complainant's claim of age discrimination, Complainant acknowledged that no remarks about or references were made about his age. Complainant asserts that given his loyalty to and longevity with the company, Respondents should not have dismissed his employment for the reasons given.

Finally, as for Complainant's claim of retaliation, Complainant acknowledged that he had not raised claims of discrimination prior to the filing of the instant complaint.

Given that there are material issues of fact and credibility, a hearing is the best venue for resolving these allegations.

Legal standards regarding probable cause determinations require that, once the investigation is complete, all remaining genuine issues of fact must be hypothetically resolved in favor of the Complainant. A determination of probable cause is not a final adjudication, but merely a determination that there should be a formal hearing on the matter.

Reviewed & Approved: _____
Linda Fenstermaker
Regional Director

## IV.   DETERMINATION

Based on the foregoing, I find probable cause to support the allegations of the complaint.

_____
Linda Fenstermaker
Regional Director

- 10 -