UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

ROBERT CROSBY, JR.,

                              Plaintiff,

        v.

STEW LEONARD'S YONKERS LLC
*and* STEW LEONARD, JR.,

                              Defendants.

———————————————————————

No. 22-CV-4907 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Karen L. Mizrahi, Esq.
Hertz Legal, PC
Croton-On-Hudson, NY
*Counsel for Plaintiff*

Loraine M. Cortese-Costa, Esq.
Law Offices of Loraine Cortese-Costa
Old Saybrook, CT
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Robert Crosby, Jr. ("Plaintiff") brings this Action against Stew Leonard's

Yonkers LLC ("Stew Leonard's Yonkers") and Stew Leonard, Jr., ("Leonard"; collectively,

"Defendants"), alleging wrongful termination and discrimination based on Plaintiff's disability

in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12132, *et seq.*,

discrimination and retaliation based upon Plaintiff's race, gender, and religion under Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, disability discrimination

under New York Human Rights Law ("NYSHRL"), New York Executive Law § 296, and

various violations sounding in retaliation and interference with the exercise of rights under the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654. (*See* Third Am. Compl. ("TAC") (Dkt. No. 52).)[1]  Before the Court are Defendants' Motion to Dismiss the TAC and Motion to Strike portions of the TAC (collectively, the "Motions").  (*See* Not. of Mot. ("Not. of Mot. 1") (Dkt. No. 55); Not. of Mot. ("Not. of Mot. 2") (Dkt. No. 57).)[2]  For the foregoing reasons, Defendants' motions are granted in part and denied in part.

## I.  Background

### A.  Motion to Strike

As an initial matter, Defendants ask this Court to strike a series of paragraphs in Plaintiff's complaint under Federal Rule of Civil Procedure 12(f).  (*See* Defs' Mem. 17–18.) Rule 12(f) provides in relevant part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). "Federal courts have discretion in deciding whether to grant motions to strike."  *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. Oct. 29, 2019) (quoting *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13-CV-538, 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013)).  "However, motions to strike under Rule 12(f) are generally 'disfavored and granted only if there is strong reason to do so.'"  *Sweigert v. Goodman*, 18-CV-8653, 2021 WL 603069, at *1 (S.D.N.Y. Feb. 16, 2021) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013)).

---

[1] Plaintiff voluntarily withdrew two claims under New York Labor Laws.  (*See* TAC ¶¶ 153–56.)

[2] Defendants filed two separate but identical motions to dismiss in this Action, filing duplicate sets of memoranda under the two different Defendants' names.  (*Compare*, *e.g.*, Mem. of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 56), *with* Mem. of Law in Supp. of Mot. (Dkt. No. 58).)  As such, the Court will only refer to one copy of Defendants' filings and assume that the arguments apply as to both Defendants.

The Second Circuit has instructed that "ordinarily" a district court should not "decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see also Frio Energy Partners, LLC. v. Finance Tech. Leverage, LLC*, —F. Supp. 3d—, 2023 WL 4211035, at *19 (S.D.N.Y. June 27, 2023) (quoting *Lipsky*). "Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Id.*; *see also Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 398 (S.D.N.Y. 2006) ("The Second Circuit has made clear that district courts should be wary when deciding whether to grant a Rule 12(f) motion on the ground that the matter is impertinent and immaterial.").  "[T]o prevail on a Rule 12(f) motion to strike, the movant must show '(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant.'" *Lynch v. Southampton Animal Shelter Found., Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011) (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)); *see also Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 429 (S.D.N.Y. 2019) ("Motions to strike under Rule 12(f) 'should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'").

Here, Defendants have asked the Court to strike paragraphs 46 through 59 of Plaintiff's complaint, because "[t]he only possible motivation for including the allegations appears to be to defame and embarrass the corporate and individual Defendants."  (Defs' Mem. 18.)  The allegations can be categorized as follows: (1) Plaintiff's identification of an Orthodox Jewish

Cemetery on Stew Leonard's Yonkers property, (*see* TAC ¶¶ 46–48); and (2) Defendants'
response to the onset of the COVID-19 pandemic and Plaintiff's allegations regarding working
conditions at Stew Leonard's Yonkers during the pandemic, (*see id*. ¶¶ 49–59).  In opposition,
Plaintiff argues that the allegations "are relevant and pertinent to illustrate [P]laintiff's concerns
about the hostile racist, sexist[,] and antisemitic work environment created by Defendants" as
well as relevant to Plaintiff's "work-related PTSD."  (Mem. of Law in Opp. to Mot. ("Pl's
Opp.") 20 (Dkt. No. 62).)

　　　As to the first category of allegations, it is clear that these allegations "have no bearing on
the relevant issues" and would prejudice the Defendants.  *Lynch*, 278 F.R.D. at 63.  Even
construing Plaintiff's allegations liberally, these three allegations have no relevance to Plaintiff's
other allegations regarding an antisemitic work environment.  At best, these allegations describe
an alleged "coverup" of a burial site, but there are no allegations that connect such activities to
antisemitic behavior.  Accordingly, the Court grants Defendants' motion to strike paragraphs 46,
47, and 48 of the TAC.

　　　However, as to the second set of allegations, the Court denies Defendants' motion.
While the Court agrees with Defendants that Plaintiff offers "scant evidence in [his] pleadings"
that these categories are relevant to Plaintiff's claims, the Court cannot find that Plaintiff's
allegations, taken as true, have no potential bearing on the issues in this case.  *See Li v. China
Merchants Bank Co., Ltd.*, No. 22-CV-9309, 2023 WL 2955293, at *3 (S.D.N.Y. Apr. 14, 2023).
Indeed, several of Plaintiff's most significant allegations revolve around Defendants' handling of
Plaintiff's COVID-19 diagnosis during the course of his employment, and his later termination
allegedly due to complications related to COVID-19.  (*See generally* TAC.)  Importantly,
Plaintiff alleges that he complained to HR and managers over Defendants' treatment of the

COVID-19 crisis, complaints which he states were "dismissed." (*Id*. ¶¶ 54–59.)  Moreover, the Court does not find that the inclusion of the paragraphs at issue would prejudice Defendants. "Courts have found allegations to be prejudicial when they are 'amorphous, unspecific and cannot be defended against' and where the allegations, if publicized, 'harm [the defendant] in the public eye and could influence prospective jury members.'" *Low v. Robb*, No. 11-CV-2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012) (quoting *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 556 (S.D.N.Y. 2002)).  Defendants assert broadly that "[t]he only possible motivation for including the allegations appears to be to defame and embarrass the corporate and individual Defendants."  (Defs' Mem. 18).  The Court has found that these allegations could be relevant to Plaintiff's various discrimination claims on the basis of his COVID-19 diagnosis. "Absent more, . . . the Court finds that keeping the paragraphs in the Complaint would not prejudice Defendants."  *Li*, 2023 WL 2955293, at *4.

Accordingly, the Court denies Defendants' motion to strike paragraphs 49–59.  *See id*. at *3–4 (granting a motion for reconsideration of a motion to strike); *Lipsky*, 551 F.2d at 893 ("[O]rdinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone"); *Ambac Assur. Corp. v. EMC Mortg. Corp.*, No. 08-CV-9464, 2009 WL 734073, at *2 (S.D.N.Y. Mar. 16, 2009) (denying motion to strike certain allegations because they "may bear" on plaintiff's claims).

### B.  Factual Background

The following facts are drawn from the Complaint and are assumed to be true for the purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Plaintiff is a male resident of Orange County in New York, who began working at Stew

Leonard's Yonkers as a "Loss Prevention Manager" in February 2001, earning $97,359.78 per

year at the time of Plaintiff's termination in September 2021.  (TAC ¶¶ 13, 16–17, 22–23.)[3]

Stew Leonard's Yonkers is a 120,000 square-foot grocery store in Yonkers, New York.  (*Id.* ¶

14.)  Defendant Leonard is a resident of Westport, Connecticut, and is the CEO of Stew

Leonard's Yonkers.  (*Id.* ¶ 15.)  Plaintiff alleges that at all times relevant to this Action, Leonard

---

[3] The Court notes a discrepancy between Plaintiff's allegations and the documents attached to Plaintiff's TAC as it relates to Plaintiff's race.  While Plaintiff states in his Complaint that he is a "white male," (*see* TAC ¶ 17), a New York State Division of Human Rights ("NYSDHR") Investigation Report states that Plaintiff is a black male, (*see* TAC Ex. 1 ("NYSDHR Rpt."), at 10 (Dkt. No. 52-2) (describing Plaintiff as "male, Black, has a disability")).

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."  *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).  "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

Here, Plaintiff attached three exhibits to his Complaint:  (1) the NYSDHR Investigation Report, (*see* NYSDHR Rpt.), (2) a NYSDHR order of dismissal for administrative convenience, (*see* TAC Ex. 2 (Dkt. No. 52-3)), and (3) a "Right to Sue" letter from the EEOC, (*see* TAC Ex. 3 (Dkt. No. 52-4)).  As Plaintiff attached these documents to the Complaint, the Court will consider them in deciding the instant Motion.  *Thomas*, 232 F. Supp. 2d at 275.

Although the Court will not accept an allegation as true when it "is contradicted by a document attached to the complaint," *see Amidax Trading Group. V. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam), the Parties have failed to note the discrepancy between Plaintiff's allegations and the NYSDHR Report.  Even if "the document controls," however, the Court's analysis remains the same.  *See id.*

"held supervisory authority over Plaintiff," including the authority to "discipline, hire, fire, affect and/or influence the terms and conditions of Plaintiff's employment." (*Id*. ¶ 18.)

### 1.  Allegations of Discrimination During Plaintiff's Employment

Plaintiff alleges that, while Stew Leonard's Yonkers "prides itself as a farm-fresh, family friendly place to work and shop," Defendants "repeatedly mistreated, ignored, threatened, bullied, and discriminated against" Plaintiff during the course of his employment. (*Id*. ¶¶ 26–27.)  Specifically, Plaintiff alleges that he and his co-workers "were subjected to a discriminatory workplace environment that was riddled with systemic racism, sexism, [and] anti[]semitism, to which Plaintiff repeatedly and continually opposed." (*Id*. ¶ 28.)

As to Plaintiff's racism-related allegations, Plaintiff alleges that Leonard made several racially charged comments throughout Plaintiff's employment. (*See id*. ¶¶ 29–31.)  For example, Plaintiff alleges that Leonard "regularly" characterized young African American male employees as "thugs," referred to another employee as "Big Black Henry" while making comments about the employee's genitalia, and referred to an African American female employee's "big black lips." (*Id*.)  On one occasion on or about March 11, 2020, Plaintiff alleges that Leonard told Plaintiff to tell another employee to "pull up his pants or get rid of him," referring to an African American employee using the n-word. (*Id*. ¶ 41.)

Plaintiff also alleges that Leonard made numerous sexist comments, referring to women as "bitches" and otherwise making sexually suggestive and explicit commentary throughout Plaintiff's course of employment. (*Id*. ¶ 36; *see also id*. ¶¶ 37–40.)  For example, Plaintiff describes a Christmas party "in the early 2000s" where Leonard "insisted that upper management wear sexually suggestive and inappropriate attire, including fake breasts, lingerie, sex toys[,] and present a sexually suggestive and offensive skit." (*Id*. ¶ 37; *see also id*. ¶ 38 (presenting additional allegations related to the alleged party).)  Plaintiff also alleges "[u]pon information

and belief" that Leonard "disseminated photographs" of his wife and other women topless on a beach throughout the workplace.  (*Id*. ¶ 39.)  In addition, on or about March 11, 2020, Plaintiff alleges that Leonard made a derogatory comment about a female customer, stating "I don't know how you guys do it working with these hot bitches all day, I'd blow my load."  (*Id*. ¶ 40.)

Finally, Plaintiff alleges that Leonard made repeated, derogatory comments regarding Jewish employees throughout his employment.  (*See id*. ¶¶ 32–35.)  Specifically, Plaintiff alleges that Leonard referred to white male Jewish employees as his "resident Jews," "Resident Yonkers Jew," and as his "Jew Boy."  (*Id*. ¶¶ 32, 35.)  On or around December 2012, Plaintiff witnessed Leonard provide a racist and antisemitic video to a Jewish employee entitled "Hannukah Song, Hood Style" which "feature[ed] African American and Hispanic men sarcastically mocking and 'celebrating' the Jewish holiday."  (*Id*. ¶ 34.)  Finally, Plaintiff alleges that Leonard repeatedly stated that "Jews were the 'worst customers to deal with.'"  (*Id*. ¶ 33.)

Plaintiff alleges that, "[o]ver the course of his near 20 years of employment, Plaintiff repeatedly and consistently, reasonably believed that Defendant Leonard['s] behavior was discriminatory and repeatedly and consistently opposed such discriminatory practices . . . by complaining to . . . the head of Human Resources and others."  (*Id*. ¶ 42.)  However, the head of HR allegedly told Plaintiff that Leonard's actions were "Stew[] just being Stew" and that "he means no harm; he has no filter."  (*Id*. (italics omitted).)  Plaintiff alleges that "Defendants not only ignored all of [Plaintiff]'s complaints, but the unlawful conduct continued, and [Defendants] threatened [Plaintiff] with disciplinary action, including the termination of his employment."  (*Id*. ¶ 45.)  In addition, "on or about 2011, Defendants began to exclude [Plaintiff] from management-wide emails, thereby taking disciplinary and retaliatory action against him."  (*Id*.)

2.  Plaintiff's Health During His Employment

Plaintiff alleges that, on or about March 5, 2020, Plaintiff "had become increasingly concerned about the lack of Personal Protective Equipment (PPE) available at Stew Leonard's of Yonkers and complained at a manager's meeting" and expressed concern about "a co-worker [who] had been in close contact with another individual who had been exposed to COVID-19, but that the Defendants had not taken any steps to quarantine this employee." (*Id*. ¶ 49.) Plaintiff alleges continued complaints throughout 2020 to managers and HR and that "Defendants were not permitting social distancing, team members were not permitted to wear protective masks and gloves" and more, but that Plaintiff's complaints were ignored. (*Id*. ¶¶ 50–56.) On or about March 28, 2020, Plaintiff complained at a manager's meeting about "having contact with multiple team members who were COVID positive," but Plaintiff alleges that the manager "dismissed Plaintiff's plea for help and guidance as to protocols and procedures." (*Id*. ¶ 57.) Plaintiff alleges that he was told by two supervisors and the head of HR "to keep quiet about Defendants['] unsafe working environment or he would lose his job." (*Id*. ¶ 59.)

On March 29, 2020, Plaintiff notified HR and management through email that he had been exposed to an employee in the receiving department who had been infected by COVID-19, seeking advice as to the COVID-19 protocol. (*Id*. ¶ 60.) Defendants "promised Plaintiff, as a precautionary measure, to remain out of work for 14 days." (*Id*. ¶ 61.) On March 31, 2020, Plaintiff emailed HR stating that another employee had contacted Plaintiff, notifying him that he was hospitalized with complications from COVID-19. (*Id*. ¶ 63.) In the email, Plaintiff stated that he had "extended contact" with the employee on March 27, 2020. (*Id*.) Plaintiff alleges that no member of HR responded to his email. (*Id*.) Defendants notified Plaintiff, however, that he was expected to return to work on April 4, 2020. (*Id*. ¶ 62). On April 3, 2020, Plaintiff tested positive for COVID-19. (*Id*. ¶ 64.)

Plaintiff was hospitalized after he experienced numerous COVID-19 related symptoms, including "low oxygen levels, shortness of breath, fever, severe gastrointestinal and digestive issues (diverticulitis), migraines, loss of smell and taste, nausea, brain fog, Epstein Barr Syndrome, Chronic Fatigue Syndrome, memory loss, muscle weakness, dizziness, blurred vision and anxiety, psoriasis, [and] mast cell activation syndrome." (*Id*. ¶ 65.) Plaintiff requested Family and Medical Leave under the Family Medical Leave Act ("FMLA"), which was granted through June 22, 2020. (*Id*. ¶ 66.) Plaintiff took additional discretionary personal leave until July 22, 2020, pursuant to his 80 hours of "banked time." (*Id*.) Plaintiff alleges that Defendants "pressured him to return to work" at the end of his FMLA leave, despite being "aware that Plaintiff was still suffering from Long Haul COVID-19." (*Id*. ¶ 67.) Plaintiff alleges that Defendants "failed to engage in the required interactive process to determine whether an accommodation was available, despite [P]laintiff's repeated requests for an accommodation." (*Id*.) At the end of Plaintiff's personal leave, "due to repeated threats from co-workers that . . . HR . . . [was] looking to terminate him," Plaintiff requested medical clearance to return to work. (*Id*.)

Sometime thereafter, Plaintiff returned to work which "proved extraordinarily difficult and his condition worsened." (*Id*. ¶ 68.) On August 13, 2020, Plaintiff alleges that his symptoms, which resembled his symptoms at the onset of his COVID-19 diagnosis, became "so debilitating that he could no longer even report to work," so Plaintiff took paid Family Personal Time ("FPT"). (*Id*.) Plaintiff alleges that "[t]hese symptoms substantially limited [his] life activities, including but not limited to difficulty breathing, difficulty walking, needing to sit frequently, [and] difficulty focusing." (*Id*.) However, Plaintiff alleges that he was "able to perform the essential function of his job with or without an accommodation" as he continued to

"work from home and the hospital while disabled." (*Id*.)  Plaintiff also alleges that, before he returned to work, Defendants "forced Plaintiff to work from home despite his condition[,] [a]lthough he had repeatedly requested . . . a reasonable accommodation at that time." (*Id*. ¶ 69.) "At no point during this period did Defendants advise Plaintiff of how much FMLA, leave, sick pay, vacation time[,] or banked time he had remining to use for the year." (*Id*. ¶ 70.)  On September 1, 2020, several coworkers told Plaintiff that he needed to return to the job or "they are going to fire you." (*Id*. ¶ 71.)  Plaintiff "[f]ear[ed] he would lose his job" and returned to work "even though he was still disabled with Long Haul COVID-19 and even though Defendants were aware of his disability." (*Id*.)

On September 4, 2020, Plaintiff asked the Vice President of the Yonkers store (Plaintiff's supervisor) for permission to leave work at 1:00PM because he was experiencing gastrointestinal issues related to his diverticulitis. (*Id*. ¶ 72.)  The Vice President allowed Plaintiff to leave, however Plaintiff alleges that "at no point did Defendants engage in the interactive process to identify a suitable accommodation that would permit [Plaintiff] to perform the essential functions of his job while he suffered from Long Haul COVID-19." (*Id*. ¶ 73.)  On September 5, 2020, Plaintiff was admitted to the hospital again with severe gastrointestinal issues, where he remained until he was released on September 11, 2020. (*Id*. ¶¶ 74–75.)  On or about September 5, 2020, Plaintiff submitted a medical note to Defendants requesting a short leave as an accommodation, "or in the alternative, the ability to work from home or create a modified schedule." (*Id*. ¶ 82.)  Plaintiff also alleges that accommodations Plaintiff requested were extended to several disabled and nondisabled employees. (*See id*. ¶ 87.)

While in the hospital on September 6, 2020, the Vice President directed Plaintiff to work "by scheduling a police detail" for the store; a request with which Plaintiff complied. (*Id*. ¶ 76.)

On September 10, 2020, Plaintiff spoke with the Vice President from the hospital, where the Vice President "acknowledged that he too had diverticulitis and knew how debilitating it was, yet he continued to demand that Plaintiff work from his hospital bed." (*Id*. ¶ 77.)  Plaintiff alleges that "[d]uring [his] period of convalescence, he repeatedly requested of the Defendants a reasonable accommodation until he fully recovered from the Long Haul COVID-19 symptoms but once again, Defendants ignored his requests." (*Id*. ¶ 78; *see also id*. ¶¶ 79–81.)

On September 28, 20202, Defendants terminated Plaintiff's employment. (*Id*. ¶ 85.)  At the time of termination, HR told Plaintiff that "he had utilized all of his 'protected leave'" which Plaintiff alleges is false. (*Id*. ¶ 86.)  Plaintiff also alleges that Defendants have failed to pay him the remaining 80 hours of "banked time" or his accrued PTO. (*Id*.)

### 3. EEOC Exhaustion

On June 1, 2021, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights ("NYSHDR") and the Equal Employment Opportunity Commission ("EEOC"). (*Id*. ¶ 8.)  On November 30, 2021, Plaintiff received a Notice of Probable Cause finding from the NYSDHR. (*Id*. ¶ 9; *see also* NYSDHR Rpt.)  On December 8, 2021, Plaintiff requested administrative dismissal of the matter before the NYSDHR to file the instant Action, which was granted on February 15, 2022. (*See* TAC ¶ 10; TAC Ex. 2 (Dkt. No. 52-3).)  On March 28, 2022, Plaintiff received a Notice of Right to Sue from the EEOC. (TAC ¶ 11; *see also* TAC Ex. 3 (Dkt. No. 52-4).)

C.  Procedural History

Plaintiff filed his initial Complaint on or about June 13, 2022.  (*See* Compl (Dkt. No.

3).)[4]  On June 17, 2022, Plaintiff filed the First Amended Complaint.  (*See* First Am. Compl.

("FAC") (Dkt. No. 8).)  On July 12, 2022, Plaintiff filed seven successive motions for default

judgment, (*see* Dkt. Nos. 11–17), however Defendants appeared on the same day, (*see* Dkt. Nos.

18–19).  On July 12, 2022, Defendants filed a pre-motion letter in anticipation of filing a motion

to dismiss.  (Dkt. Nos. 21–22.)  On July 19, 2022, Plaintiff filed a letter in response requesting

leave to amend the FAC, (*see* Dkt. No. 24), which the Court granted shortly thereafter, (*see* Dkt.

No. 26).

On August 18, 2022, Plaintiff filed his Second Amended Complaint.  (*See* Sec. Am.

Compl. ("SAC") (Dkt. No. 27).)  On August 26, 2022, Defendants filed a pre-motion letter in

anticipation of filing a motion to dismiss.  (Dkt. Nos. 35–36.)  After receiving an extension to

answer, (*see* Dkt. Nos. 38–40), Plaintiff responded to Defendants' letter on September 11, 2022,

(*see* Dkt. Nos. 42–43).  The Court held a pre-motion conference on October 17, 2022, and

adopted a briefing schedule.  (*See* Dkt. (minute entry for Oct. 17, 2022); Order (Dkt. No. 47)).

On October 18, 2022, Plaintiff filed a letter to the Court seeking clarification as to whether, if he

removed two claims, the Court would "disallow Defendant[s'] motion to dismiss[,]" and

requested an opportunity to file an amended complaint.  (*See* Dkt. No. 48.)  The Court allowed

Plaintiff to file another amended complaint, but noted that Defendants were still allowed to file

---

[4] Plaintiff first filed a Complaint on June 11, 2022, but refiled the Complaint on June 13, 2022 due to a clerical error.  (*See generally* Dkt.)

their Motion to Dismiss regardless of any changes to the amended complaint.  (Dkt. No. 49.)  On or about October 24, 2022, Plaintiff filed his TAC.  (*See* TAC.)[5]

On September 7, 2022, Defendants filed the instant Motions.  (*See* Not. of Mot. 1; Not. of Mot. 2; Defs' Mem.; Mem. of Law in Supp. of Mot. (Dkt. No. 58).)  Plaintiff filed his Opposition on October 7, 2022.  (*See* Pl's Opp.)  On December 13, 2022, Defendants filed their Reply.  (*See* Reply Mem. in Supp. of Mot. ("Defs' Reply") (Dkt. No. 63); Reply Mem. in Supp. of Mot. (Dkt. No. 64).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[]

---

[5] Plaintiff first filed a TAC on October 24, 2022, but refiled the TAC on October 25, 2022 due to a clerical error.  (*See generally* Dkt.)

across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Division 1181*, 9 F.4th at 95 (citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

### B.  Analysis

Defendants argue that the TAC should be dismissed in its entirety, arguing that the Complaint does not set forth plausible claims of disability discrimination, (Defs. Mem. 7–12); failure to accommodate, (*see id.*); retaliation claims under Title VII or the NYSDHR, (*see id.* at 12–15); or any claims under the FMLA, (*see id.* at 15–17).  The Court will address each argument to the extent necessary to resolve the instant Motion.

### 1.  ADA Discrimination Claims

Plaintiff asserts two claims against Defendants under the ADA and NYSHRL for disability discrimination and failure to accommodate.  (*See* TAC ¶¶ 88–114.)  Defendants argue that Plaintiff has not sufficiently alleged either a disability discrimination or failure to accommodate claim under the ADA and the NYSHRL because (1) Plaintiff has not plausibly alleged an unlawful motive based on Plaintiff's disability, (*see* Defs' Mem. 8–9), and (2) Plaintiff has not plausibly alleged that he was unable to perform the essential functions of his job with or without a reasonable accommodation, (*see id*. at 10–12).  Because both of Defendants' arguments touch upon similar elements of both a disability discrimination and a failure to accommodate claim, the Court will address both simultaneously.

### a.  Legal Standards

A defendant violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).  Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . "  N.Y. Exec. Law § 292(21). "NYSHRL claims are analyzed as ADA claims."  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019); *see also McKenna v. Santander Inv. Sec. Inc.*, No. 21-CV-941, 2022 WL 2986588, *7 (S.D.N.Y. July 28, 2022) ("Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims." (citing *Fox*)).

"To establish a prima facie case of disability discrimination under the ADA or NYSHRL, a plaintiff must show that (1) the defendant is a covered employer; (2) the plaintiff suffered from,

or was regarded as suffering from, a disability within the meaning of the statute; (3) the plaintiff was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability or perceived disability." *Dobbs v. NYU Langone Medical Ctr.*, No. 18-CV-1285, 2021 WL 1177767, at *5 (S.D.N.Y. Mar. 29, 2021) (italics omitted) (citing *Fox*, 918 F.3d at 71; and *Jacobs v. New York City Dep't of Educ.*, 768 F. App'x 86, 87 (2d Cir. 2019) (summary order)).[6] A plaintiff must plead facts plausibly supporting that a "minimal inference of discriminatory motivation" existed in connection with the adverse employment action. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Dooley v. JetBlue Airways Corp.*, 636 Fed. App'x 16, 21–22 (2d Cir. 2015) (applying the "minimal inference" standard to ADA discrimination claims). "[T]he reduced burden of plausibly alleging facts tending to show a 'minimal inference' of discrimination does not obviate the requirement that Plaintiff plausibly allege that he is disabled within the meaning of the ADA." *Everitt v. Jarvis Airfoil, Inc.*, No. 19-CV-1853, 2020 WL 7230858, at *3 (D. Conn. Dec. 8, 2020) (citing *Littlejohn*, 795 F.3d at 311).

"To establish a prima facie case for failure to provide a reasonable accommodation, the plaintiff must establish: (1) [his] employer is subject to the [NYSHRL]; (2) []he was disabled within the meaning of the [NYSHRL]; (3) []he was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the employer refused to

---

[6] One key difference between the NYSHRL and the ADA is that the NYSHRL has a broader definition of disability than does the ADA in that it does not require any showing that the disability substantially limits a major life activity. *See Ugactz v. U.P.S., Inc.*, 10-CV-1247, 2013 WL 1232355, at *14 (E.D.N.Y. Mar. 26, 2013); *see also Welch v. U.P.S., Inc.*, 871 F. Supp. 2d 164, 198 (E.D.N.Y. 2012) (noting that NYSHRL is not a "carbon copy of the ADA"). Rather, "[u]nder the NYSHRL . . . , Plaintiff need only prove that [s]he has a 'medically diagnosable impairment.'" *Ugactz*, 2013 WL 1232355, at *14 (quoting *Attis v. Solow Realty Dev. Co.*, 522 F. Supp. 2d 623, 631–32 (S.D.N.Y. 2007)).

make such accommodations." *McKenna*, 2022 WL 2986588, at *7 (underline omitted) (citing

*Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)).  "Once [the] plaintiff [has] satisfied his burden

of 'production and persuasion as to the existence of an accommodation that is facially

reasonable,' the burden 'shifts to the defendant to rebut the reasonableness of the proposed

accommodation,' which 'is in essence equivalent to the burden of showing, as an affirmative

defense, that the proposed accommodation would cause the defendant to suffer an undue

hardship.'" *Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 514 (S.D.N.Y. 2020)

(quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016)).

### b.  Analysis

Defendants appear to concede—or at least do not contest for purposes of their Motion—

that (1) Defendants are subject to the ADA and the NYSHRL, and (2) Plaintiff is a person with a

disability under the meaning of the ADA and the NYSHRL.  (*See generally* Defs' Mem.)

However, Defendants first argue that Plaintiff has not pled a plausible claim of a discriminatory

motive based upon Plaintiff's disability.  (*See* Defs' Mem. 8–9.)  Citing *Boncoeur v.*

*Haverstraw-Stony Point Central School Dist.*, No. 20-CV-10923, 2022 WL 845770 (S.D.N.Y.

Mar. 22, 2022), Defendants argue that Plaintiff has failed to provide sufficient allegations to

support an inference of discriminatory motive because he does not cite any "allegations of

degrading comments related to Plaintiff's claimed disability status or to disabilities in general" or

otherwise successfully allege disparate treatment.  (*See* Defs' Mem. 8–9.)  However, Defendants

mistakenly cite to a heightened standard for a discriminatory motivation as required for

discrimination claims under § 1983 or Title VII.  *See Boncouer*, 2022 WL 845770, at *5

(describing the elements of discrimination under Title VII, the ADEA, and § 1981, and § 1983).

Under the ADA and NYSHRL, Plaintiff must only plead facts to plausibly support a "minimal

inference of discriminatory motivation."  *Littlejohn*, 795 F.3d at 311; *see also Dooley*, 636 Fed.

18

App'x. 16 at 22 (applying the standard to ADA discrimination claims); *Baluch v. 300 West 22 Realty LLC*, No. 21-CV-9747, 2023 WL 112547, at *3 (S.D.N.Y. Jan. 5, 2023) (same); *Basso v. Willow Run Foods, Inc.*, 577 F. Supp. 3d 73, 82 (N.D.N.Y. 2022) (same).

Here, Plaintiff has pleaded sufficient facts to support a minimal inference of discriminatory motivation.  To support a discriminatory animus, Plaintiff alleges that: (1) he repeatedly complained to management about Defendants adherence to COVID-19 protocols and was told to "keep quiet . . . or he would lose his job," (TAC ¶¶ 54–59); (2) when Plaintiff contracted COVID-19, Defendants "pressured him to return to work" at the end of his FMLA leave despite being "aware that Plaintiff was still suffering from Long Haul Covid-19, (*id*. ¶ 67; *see also id*. ¶¶ 65–68); (3) Defendants expected Plaintiff to work while on medical leave, (*id*. ¶¶ 69, 76–77); (4) co-workers indicated that Plaintiff needed to return to work while on leave "or they are going to fire [him]," (*id*. ¶ 71); (5) Defendants denied his requested accommodations, (*id*. ¶¶ 80–84); and (6) Plaintiff was terminated approximately two weeks after Plaintiff's second hospitalization, (*id*. ¶¶ 75, 85).[7]  This is sufficient to support a "minimal inference of discriminatory motivation."  *See Basso*, 577 F. Supp. 3d at 82 (finding a plaintiff's five sets of allegations taken together sufficient to support a minimal inference, where a plaintiff alleged, among other things, that the defendant "expected him to work while on medical leave," "denied

---

[7] However, Defendants are correct that Plaintiff may not have adequately pled comparative treatment as a vehicle for Plaintiff's disability discrimination claim.  (*See* Defs' Mem. 9.)  Plaintiff alleges "[u]pon information and belief" that "the accommodations requested by Plaintiff were extended to favored disabled and nondisabled employees."  (TAC ¶ 87.)  This allegation cannot establish a plausible inference of discriminatory motivation, but instead infers that Defendants provided the same accommodations to employees within and outside of the protected class.  Accordingly, Plaintiff cannot establish an inference of discriminatory intent because his allegation forecloses the argument that Defendants provided "more favorable treatment of employees not in the protected group."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

his requested accommodations," and cited "the timing of [the] plaintiff's termination giv[ing] rise to an inference of discrimination"); *Kopchik v. Town of East Fishkill, N.Y.*, 759 Fed. App'x. 31, 37–38 (2d Cir. 2018) (summary order) (finding allegations that the defendant offered plaintiff "only employment that it believed he was substantially unable to perform . . . satisfy the minimal pleading threshold as to the causation element of Kopchik's ADA and NYSHRL discrimination claims"); *Dooley*, 636 Fed. App'x at 21–22 (applying minimal inference standard to an ADA discrimination claims where a plaintiff alleges that she was not "afforded" any steps in a progressive discipline policy, followed by a suspension without pay and termination).

Defendants also argue that, at the time of Plaintiff's termination, he was "not able to work with or without a reasonable accommodation" because he could not perform the essential function of his position.  (Defs' Mem. 10–12.)  In a failure to accommodate claim, "[t]he plaintiff bears the burden of showing that 'the accommodation exists that permits her to perform the job's essential functions.'"  *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010, 2019 WL 294309, at *6 (S.D.N.Y. Jan. 23, 2019) (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)).  "If the plaintiff satisfies this burden, the defendant has the burden of proving that the proposed accommodation is not reasonable."  *Id*.  While the ADA does not define the term "essential functions," the EEOC has promulgated regulations that indicate the term "encompasses 'the fundamental job duties of the employment position.'"  *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 98 (2d Cir. 2009) (quoting 29 C.F.R. § 1630.2(n)(1)). And, as before, a "qualified individual" under the NYSHRL is "interpreted coextensively" with the ADA.  *Williams v. MTA Bus Co.*, 44 F.4th 115, 124 (2d Cir. 2022).  Ultimately, whether a given task "constitutes an essential function depends on the totality of the circumstances."  *Rodal*

*v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004).  Evidence of whether a

particular duty is an essential function under the ADA or NYSHRL may include:

> (i) The employer's judgment as to which functions are essential; (ii) [w]ritten job
> descriptions prepared before advertising or interviewing applicants for the job; (iii)
> [t]he amount of time spent on the job performing the function; (iv) [t]he
> consequences of not requiring the incumbent to perform the function; (v) [t]he
> terms of a collective bargaining agreement; (vi) [t]he work experience of past
> incumbents in the job; and/or (vii) [t]he current work experience of incumbents in
> similar jobs.

*Lavender v. Verizon N.Y. Inc.*, No. 17-CV-6687, 2023 WL 1863245, at *16 (E.D.N.Y. Feb. 9,

2023) (quoting *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 645 (2d Cir. 2021) (summary

order) and citing 29 C.F.R. § 1630.2(n)(3)).  "The inquiry into whether a particular function is

essential for any given position is a fact intensive one."  *Id*. (citing *Hunt-Watts v. Nassau Health

Care Corp.*, 43 F. Supp. 3d 119, 127 (E.D.N.Y. 2014)).

　　　While Plaintiff's allegations regarding his ability to perform the essential functions of the

position are slim, Plaintiff has plausibly alleged that, with or without a reasonable

accommodation, he can perform the "essential functions" of his position.  Plaintiff alleges that,

while suffering from numerous symptoms of Long Haul COVID-19, he "was able to perform the

essential function of his job with or without an accommodation" because he worked from home

during his employment with Defendants.  (*See* TAC ¶¶ 68–69; 73, 76, 82.)  Defendants argue

that "the Complaint describes the 'paramount' function of [Plaintiff's] job position as 'safety and

security' of the store premises which undermines any contention that he could have performed

them from home."  (Defs' Mem. 10.)  Indeed, chronic absenteeism can be a grounds for

dismissal at a motion to dismiss.  *See Soto v. Marist College*, No. 17-CV-7976, 2019 WL

2371713, at *14 (S.D.N.Y. June 5, 2019) (granting a motion to dismiss where a plaintiff

"nowhere explains whether circumstances had changed such that he would be capable of

performing the essential functions of his position" where he was required to report to classes to teach and could not appear due to health problems); *Lewis v. N.Y.C. Police Dep't*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) ("[C]ourts have specifically noted that the ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." (alterations and quotation marks omitted) (collecting cases)), *aff'd*, 537 F. App'x 11 (2d Cir. 2013) (summary order); *Pierce v. Highland Falls-Fort Montgomery Cent. Sch. Dist.*, No. 08-CV-1948, 2011 WL 4526520, at *5 (S.D.N.Y. Sept. 28, 2011) ("The ADA does not require an employer to make a reasonable accommodation for an employee who does not attend work, nor does the Act require an employer to retain such an employee."); *Guardino v. Vill. of Scarsdale Police Dep't*, 815 F. Supp. 2d 643, 648 (S.D.N.Y. 2011) (granting motion to dismiss ADA claim based on termination for leaving his guard post to use the bathroom because the plaintiff "has not alleged that any accommodation, other than being allowed to leave his post, would resolve the symptoms he experiences").  However, here Plaintiff has repeatedly alleged that he *could* work from home in his position, alleging at least one specific example where he "schedule[ed] a police detail for the Defendant[s'] store."  (*See* TAC ¶ 76.)

Thus, contrary to Defendants' argument, the Court cannot dismiss plaintiff's claims solely on the general proposition that employer attendance expectations constitute essential job functions, especially given the Second Circuit's guidance to the contrary.  In *McMillan v. City of New York*, 711 F.3d 120 (2d Cir. 2013), the Second Circuit unambiguously held that "[p]hysical presence at or by a specific time is not, as a matter of law, an essential function of all employment." *Id*. at 126 (emphasis added).  The court went on to note that, "[w]hile a timely arrival is normally an essential function, a court must still conduct a fact-specific inquiry." *Id*.; *see also Ray v. Weit*, 708 F. App'x 719, 722 (2d Cir. 2017) (summary order) (noting that

"reasonable accommodations can include a modified work schedule").  To determine whether a function is essential, a court must consider a "number of relevant factors," including "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *McMillan*, 711 F.3d at 126.  In light of *McMillan*, the Court must conduct a "penetrating factual analysis" of plaintiff's particular job duties to determine whether and to what extent attendance and punctuality are essential job functions.  *Id.* at 126.  Similarly, to determine whether a requested accommodation is reasonable, the Court must engage in a "fact-specific inquiry" and consider, "among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."  *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).

At this stage, the Court must accept as true Plaintiff's allegations that he could perform the essential functions of the position with or without Plaintiff's requested accommodations. Because "the nature of a job's essential functions is a fact-bound question ill-suited for resolution on a motion to dismiss," the Court denies Defendants' motion to dismiss the ADA discrimination claim.  *Miller v. Kendall*, No. 14-CV-393, 2016 WL 4472748, at *2 (W.D.N.Y. Aug. 25, 2016); *see also Lewis v. Livingston Cty. Ctr. for Nursing & Rehab.*, 30 F. Supp. 3d 196, 211 (W.D.N.Y. 2014) (collecting cases and concluding that whether an accommodation is reasonable is a question "better reserved for summary judgment or trial rather than the pleading stage").[8]

---

[8] Defendants also argue that "information attached to the complaint reflects that Plaintiff was asked to have his medical provider give an estimated return to work date" which was never provided to Defendants.  (Defs' Mem. 10–12.)  It appears that Defendants are referring to a portion of the NYSDHR report discussing emails and doctor's notes provided in July and

2.  Retaliation Under Title VII and the NYSDHR

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against

any of his employees . . . because [the employee] has opposed any practice made an unlawful

employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a).  In other words, "Title VII

forbids an employer to retaliate against an employee for . . . complaining of employment

discrimination prohibited by Title VII[.]"  *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461

F.3d 199, 205 (2d Cir. 2006).  Courts analyze claims for retaliation pursuant to Title VII under

the familiar framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)

("Federal and state law retaliation claims are reviewed under the burden-shifting approach of

*McDonnell Douglas*[.]").  "Under the first step of the *McDonnell Douglas* framework, the

plaintiff must establish a prima facie case of retaliation[.]"  *Id*. at 844 (citation omitted).  Once

the plaintiff has done so, "the burden shifts to the employer to articulate some legitimate, non-

retaliatory reason for the employment action."  *Id*. at 845 (citation omitted).  "The employee at

all times bears the burden of persuasion to show retaliatory motive."  *Cox v. Onondaga Cnty.*

*Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).  "As with other claims analyzed under the

September of 2020.  (NYSDHR Rpt. at 15–16.)  However, without the emails or other relevant
information attached to the Complaint, there is simply insufficient information at this stage of the
case to state that this report somehow contradicts Plaintiff's allegations in the Complaint.

This is unsurprising—all of the cases Defendants cite for the proposition that a lack of
certainty for returning to work were found at summary judgment, not at this early stage of the
instant Action.  *See Mitchell v. Washingtonville Cent. School Dist*, 190 F.3d 1, 9 (2d Cir. 1999)
(finding summary judgment was appropriate where the employer was not required to grant the
plaintiff "an indefinite leave of absence" in "the absence of any indication from him in his
correspondence . . . that . . . he expected to be able to return"); *Brown v. The Pension Boards*,
488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) ("After Brown's termination, he requested an open-
ended, indefinite leave of absence with no guarantee that it would actually enable him to
eventually return to work to perform his essential job functions.  Such a request goes beyond the
requirements of the ADA.").

*McDonnell Douglas* framework, the allegations need only give plausible support to the reduced

prima facie requirements." *Thomson v. Odyssey House*, No. 14-CV-3857, 2015 WL 5561209, at

*20 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) (quotation marks omitted).

Retaliation claims under Title VII and the NYSHRL are subject to the same standard.  *See*

*Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 343–44 (S.D.N.Y. 2017)

(treating retaliation claims under Title VII and the NYSHRL under the same standard), *aff'd*, 788

F. App'x 779 (2d. Cir. 2019).  The Court therefore evaluates the substance of each of Plaintiff's

retaliation claims—whether under Title VII or the NYSHRL—congruently.

 To establish a prima facie case of retaliation, the plaintiff must show that: "(1) he was

engaged in an activity protected under Title VII; (2) his employer was aware of his participation

in the protected activity; (3) the employer took adverse action against him; and (4) a causal

connection existed between the protected activity and the adverse action." *Zann Kwan*, 737 F.3d

at 850 (Parker, J., concurring in part) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d

111, 116 (2d Cir. 2000)).  Accordingly, "for a retaliation claim to survive . . . a motion to

dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an

adverse employment action—against him, (2) 'because' he has opposed any unlawful

employment practice." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 90 (2d Cir.

2015) (citation omitted).  To establish the causal connection, Plaintiff must plausibly allege that

retaliation was "a 'but-for' cause of the employer's adverse action." *Farmer v. Shake Shack*

*Enters., LLC*, 473 F. Supp. 3d 309, 332–33 (S.D.N.Y. 2020).  A plaintiff may establish causation

either through direct evidence of retaliatory animus or through indirect evidence, by showing that

discriminatory treatment closely followed the protected activity.  *Id*. at 333.  "A plaintiff's

burden at this prima facie stage is de minimis." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (italics omitted).

"The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *see also Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) ("[R]etaliation is unlawful when the retaliatory acts were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (quotation marks omitted)). Accordingly, "an action need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 n.6 (2d Cir. 2010).

Here, Plaintiff argues—without citation—that he has "identified at least eleven instances [wherein he engaged in protected activity] and alleges [a] discriminatory workplace environment riddled with systemic racism, sexism[,] and antisemitism" which he consistently opposed. (Pl's Mem. 16.) However, and as implicitly argued by Defendants, (*see* Defs' Mem. 14–15), the Court cannot identify such eleven instances. Instead, at best, Plaintiff has alleged two potential adverse employment actions: (1) Plaintiff alleges that Defendants "ignored all of [his] complaints . . . [and] they threatened [Plaintiff] with disciplinary action, including the termination of employment[,]" (TAC ¶ 45); and (2) in 2011, "Defendants began to exclude [Plaintiff] from management-wide emails," (*id*). Neither of the adverse employment actions described by Plaintiff is sufficient to sustain a retaliation claim under Title VII or the NYSDHR.

While "[t]here is no question . . . that Plaintiff's reports to [HR] about [Leonard's] [discriminatory] comments may qualify as protected activity[,]" *Vaughn v. Empire City Casino*

*at Yonkers Raceway*, No. 14-CV-10297, 2017 WL 3017503, at *21 (S.D.N.Y. July 14, 2017), this "indirect evidence," must be supported by allegations showing that discriminatory treatment "closely followed" the protected activity, *Farmer*, 473 F. Supp. 3d at 333.  Although the Second Circuit "ha[s] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [a protected activity] and an allegedly retaliatory action," *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013), the temporal proximity must be "very close,"  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (quotation marks omitted).  "[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."  *Flood v. UBS Asset Mgmt.*, No. 10-CV-374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (citation omitted); *see also Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 343 (S.D.N.Y. 2020) (citing *Flood*).

Plaintiff also alleges that he overheard discriminatory comments by Leonard in March 2020.  (TAC ¶¶ 40–41; *see also* Pl's Mem. at 17 ("Plaintiff's last complaint of unlawful activity was March 2020.").)  Though Plaintiff argues that a six-month gap between the protected activity and his termination is reasonable "under the unique circumstances surrounding Plaintiff's disability and COVID's impact on the workplace should allow for an inference of causation," (Pl's Mem. 17–18), Plaintiff provides not a single case to support such an assertion.  Moreover, as Defendants point out, (*see* Defs' Mem. 13–14), the Supreme Court and numerous courts within the Second Circuit have consistently held that much shorter periods of time are too attenuated to support causation through temporal proximity.  *See, e.g.*, *Clark Cty. Sch. Dist.*, 532 U.S. at 273–74, (citing cases where three to four months deemed insufficient); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) (finding three-and-a-half months insufficient);

27

*Smith*, 440 F. Supp. 3d at 343 (finding gaps of three and four months insufficient to establish an inference of causal connection); *Caddick v. Pers. Co. I LLC*, No. 16-CV-7326, 2018 WL 3222520, at *9 (S.D.N.Y. June 29, 2018) ("Nine or ten weeks is at the outer bounds of what is acceptable where, as here, a plaintiff relies solely on temporal proximity to demonstrate causation."); *Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases requiring, for a retaliatory inference to arise, adverse activity to occur within approximately two months of plaintiff's protected activity).

To the extent that Plaintiff is also arguing that his termination occurred, "against a backdrop of continuing antagonism and frustration of [Plaintiff's] professional ambitions," which, in some cases, can "establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn," this too must fail.  *See Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018).  Indeed, "[t]emporal gaps that are too long to give rise to an inference of causation may be bridged by an intervening pattern of retaliatory treatment." *Burgos v. City of New York*, No. 18-CV-1150, 2019 WL 1299461, at *10 (S.D.N.Y. Mar. 21, 2019) (quotation marks omitted); *see also Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) ("Even though an alleged act of retaliation may be separated by a significant gap in time from the date on which a complaint of discrimination was made, evidence of an intervening pattern of antagonism . . . could support an inference that an alleged retaliatory act . . . was causally related to [a] complaint of discrimination.").  Where such a pattern exists, "the court will find but-for causation even if there might be another motivating factor."  *Butts v. N.Y.C. Dep't of Educ.*, No. 16-CV-5504, 2018 WL 4725263, at *13 (E.D.N.Y. Sept. 28, 2018).  However, Plaintiff only makes vague and unsupported allegations that Defendants "threatened [Plaintiff] with disciplinary action, including the termination of his

employment" without providing any concrete examples of such threats, dates when they occurred, or allege *any* specific information to support such an inference.  (*See* TAC ¶ 45.)  This is fatal to Plaintiff's claim.  *See Tenemille v. Town of Ramapo*, No. 18-CV-724, 2020 WL 5731964, at *13 (S.D.N.Y. Sept. 24, 2020) (finding that a plaintiff did not pled sufficient facts to establish a backdrop of continuing antagonism where the plaintiff made "vague statements about when these events occurred" or did not "clarify whether the events occurred before or after he reported" the discriminatory conduct); *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (dismissing a retaliation claim where the complaint "fails to state with even a modicum of specificity when the relevant events occurred"); *Winston v. City of New York*, No. 12-CV-395, 2013 WL 4516097, at *4 (E.D.N.Y. Aug. 23, 2013) (finding allegations "too vague in nature and non-specific as to time . . . to serve as a basis for [the plaintiff's] retaliation claims" (quotation marks omitted)).

Plaintiff's only remaining alleged adverse employment action is that, in 2011, "Defendants began to exclude [Plaintiff] from management-wide emails."  (TAC ¶ 45.) However, beyond the fact that this "began" to occur nine years prior to Plaintiff's termination, "[t]he allegation that Plaintiff was not included on an e[]mail . . . does not rise to the level of an adverse employment action[,]" because it "amounts to a petty slight or minor annoyance."  *Ziyan Shi v. N.Y. Dep't o f State, Div. Licensing Servs.*, 393 F. Supp. 3d 329, 339 (S.D.N.Y. 2019) (alterations and quotation marks omitted); *see also Meagher v. State Univ. Construction Fund*, No. 17-CV-903, 2020 WL 5504011, at *20 (N.D.N.Y. Sept. 11, 2020) (finding where a defendant "took over various responsibilities . . . without telling [the plaintiff], including cancelling or not inviting her to meetings or not including her on emails" to be "petty slights or

minor annoyances," rather than "materially adverse actions, whether or not [the p]laintiff subjectively felt humiliated and excluded" (quotation marks omitted)).

Accordingly, because Plaintiff has not sufficiently alleged any adverse action that resulted from protective activity, Plaintiff's retaliation claims under Title VII and the NYSDHR are dismissed.

### 3. FMLA Claims

#### a. Retaliation

FMLA retaliation claims are analyzed under the three-step burden-shifting analysis set forth in *McDonnell Douglas*. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). "To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (alteration omitted). For the purposes of FMLA retaliation claims, an "adverse employment action" is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). "Petty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." *Id.* at 165 (alteration omitted). However, where a plaintiff alleges multiple adverse acts, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 512 (E.D.N.Y. 2018) (quoting *Hicks*, 593 F.3d at 165). "[T]he standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims." *Vaughn v. City of New*

*York*, No. 06-CV-6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010).  But-for causation

is not required under the FMLA.  *See Woods v. START Treatment & Recovery Centers, Inc.*, 864

F.3d 158, 169 (2d Cir. 2017) (holding that a jury instruction of "but[-]for" causation for FMLA

retaliation was erroneous).

Here, Defendants argue that Plaintiff has failed to allege the requisite inference of

unlawful motivation on the part of Defendants.  (*See* Defs' Mem. 15–16.)  The Court agrees.  As

with a claim for retaliation under Title VII and the NYSDHR, *see supra* Section II.B.2., an

inference of retaliatory intent in the FMLA context can be shown when a "causal connection

exists between the plaintiff's protected activity and the adverse action taken by the employer,"

which can manifest from "very close" temporal proximity between the protected activity and

adverse action.  *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir.

2012).  Here, Plaintiff does not plausibly allege that Defendants terminated him in retaliation for

exercising her FMLA leave.  Plaintiff alleges that he requested and was granted FMLA leave

after being diagnosed with COVID-19, which he took until June 22, 2020.  (TAC ¶ 66.)  At the

end of this leave, Plaintiff then took "discretionary personal leave until July 22, 2020."  (*Id.*)

Plaintiff never alleges that he requested FMLA leave again or otherwise attempted to exercise

this right, nor has Plaintiff alleged any direct evidence of retaliatory intent related to his FMLA

leave aside from a brief, conclusory allegation that "[t]he company reluctantly granted his leave

request."  (*Id.*)  As such, "the duration of time between [Plaintiff] exercising [his] FMLA leave

and [his] termination was not particularly short, at approximately three months."  *Desiderio v.*

*Hudson Techs.*, No. 22-CV-541, 2023 WL 185497, at *5 (S.D.N.Y. Jan. 13, 2023).  "In the

absence of any further evidence suggesting retaliation, months of separation between protected

activity and alleged retaliation cannot be considered very close."  *Miller v. McHugh*, 814 F.

Supp. 2d 299, 321 (S.D.N.Y. 2011) (finding temporal proximity of five months insufficient to establish a causal connection); *see also Harrisman v. City of New York Dep't of Transportation*, No. 19-CV-2986, 2020 WL 5211043, at *5 (S.D.N.Y. Sept. 1, 2020) (same for a period of three to four months); *Seitz v. New York State*, No. 18-CV-4149, 2019 WL 4805257, at *11 (E.D.N.Y. Sept. 30, 2019) ("There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference.").

        In relevant opposition, Plaintiff argues that he "pleads [that the] adverse job action occurred while out on FMLA." (Pl's Mem. 14–15.) However, this is inconsistent with Plaintiff's own allegations. Plaintiff's allegations are clear that he took FMLA leave until June 22, 2020 and, as alleged, took any remaining leave as personal time or sick time. (*See* TAC ¶ 66–67.) This makes sense, as "[t]he FMLA provides generally that a covered employer is required to grant an eligible employee *up to a total of 12 weeks of* leave *during any 12-month period* for personal or family needs indicated in the Act." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (emphasis added) (citing 29 U.S.C. § 2612(a)). While Plaintiff does not allege the exact date that his FMLA leave began, calculating it from the time Plaintiff was first exposed to COVID-19 on March 29, 2020, (*see* TAC ¶ 60), Plaintiff likely exhausted his allotted 12 weeks of leave during the 12-month period. Thus, it is not plausible that Plaintiff was *still* on FMLA leave, despite whatever he understood from his communications from HR, at the time of his termination in September 2020. As such, any supposed inference related to Plaintiff's termination and its relation to his FMLA leave cannot stand due to lack of temporal proximity. *Cf. Reilly v. Revlon*, 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2009) ("Plaintiff argues that a retaliatory inference can be drawn because she was terminated while she was on sick leave for

the same medical condition that caused her to continue her FMLA leave.  If plaintiff's argument were accepted by courts, judges would effectively amend FMLA to expand plaintiff's right to reinstatement beyond the twelve weeks provided by Congress, since it would always be possible to infer a retaliatory motive if an employee's condition persisted beyond twelve weeks.")

Accordingly, as Plaintiff has not sufficiently pleaded retaliatory intent, the Court grants Defendants' motion to dismiss the FMLA retaliation claim.

### b.  Interference

To establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need only prove that an "employer in some manner impeded the employee's exercise of his or her right[s]" protected provided by the FMLA.  *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 176 (2d Cir.2006) (quoting *Potenza*, 365 F.3d at 168).  To establish a claim of FMLA interference, a plaintiff must establish that: (1) "he is an eligible employee under the FMLA"; (2) the defendant is "an employer as defined by the FMLA"; (3) the plaintiff "was entitled to take leave under the FMLA"; (4) the plaintiff gave the employer notice of his or her intention to take leave; and (5) the plaintiff "was denied benefits to which [she] was entitled under the FMLA." *Graziadio*, 817 F.3d at 424; *see also Patel v. NYU Langone Hosps.*, No. 20-112, 2021 WL 4852426, at *3 (2d Cir. Oct. 19, 2021) (summary order) (applying the same five-factor test).

Here, Plaintiff argues that "it is irrefutable that asking a disabled person to work while out on disability leave and hospitalized[] denies him the full benefit of leave under [the] FMLA." (Pl's Mem. 14.)  Defendants argue that "[t]here are no allegations of interference occurring during [the] 12-week [FMLA] period and Plaintiff was reinstated to his position twice after that leave had expired."  (Defs' Mem. 16.)  The Court agrees that Plaintiff has not sufficiently alleged an FMLA interference claim.  Plaintiff alleges that he received his FMLA leave after requesting it in March 2020 through June 22, 2020. (TAC ¶ 66.)  It is only "[a]t the end of his FMLA

leave" that Defendants allegedly "pressured him to return to work and failed to engage in the required interactive process to determine whether an accommodation was available." (*Id*. ¶ 67.) While Plaintiff is correct that, in some circumstances, a plaintiff can allege an interference claim by "forcing [a plaintiff] to work from home during" the FMLA leave period, *see Reilly*, 620 F. Supp. 2d at 536–37, Plaintiff does not allege that he was required to perform any work or otherwise did any work during his FMLA leave. Plaintiff's allegations to this effect all postdate Plaintiff's FMLA leave. (*See* TAC ¶¶ 67–71; 74–77.)

Moreover, to the extent Plaintiff is attempting to argue that Defendants "fail[ed] to provide [him] with necessary information about its FMLA leave policies" which "affect[ed] [his] ability [to] exercise [his] substantive right[,]" "where the lack of notice [has] had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act, no denial has occurred." *Desiderio*, 2023 WL 185497, at *3 (quotation marks omitted) (quoting *Sarno v. Douglas Elliman-Gibson & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999)); *see also Sarno*, 183 F.3d at 161–62 ("[The plaintiff-employee's] right to reinstatement could not have been impeded or affected by the lack of notice because his leave was caused by a serious health condition that made him unable to perform the functions of his position, and it is undisputed that that inability continued for some two months after the end of his 12-week FMLA period." (alterations, quotation marks, and citations omitted)); *Ragsdale v. Wolverine World Wide, Inc*, 535 U.S. 81, 91 (2002) ("The purpose of the [FMLA interference] cause of action is to permit a court to inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions.").

Accordingly, the Court grants Defendants' motion to dismiss the FMLA interference claim.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part.  Specifically, Plaintiff's disability discrimination claim under the ADA and the NYSHRL survive, and all other claims are dismissed.  Defendants' Motion to Strike is also granted in part and denied in part.  Specifically, the Court strikes paragraphs 46–48 of the TAC, and all other paragraphs stand.  Because this is the first adjudication of Plaintiff's claims on the merits, the Court will deem the dismissal of the claims as without prejudice.  To the extent Plaintiff has a good faith basis for filing an amended complaint to allege additional facts and otherwise addressing the deficiencies identified above, he must do so within 30 days of the date of this Opinion & Order.

The Clerk of Court is respectfully requested to terminate the pending motions at Dkt. Nos. 55 and 57.  The Court will hold a status conference on October 10, 2023, at 2:00 PM. SO ORDERED.

Dated:   September 28, 2023
         White Plains, New York

_____
     KENNETH M. KARAS
   United States District Judge

35